

Photos by LARA SOLT/Staff Photographer

opping trip to Half Price Books.

y TINA DANZE
Special Contributor

irst, Bob Spies was angry
en he opened the gift from
te Bilheimer.

was nothing wrong with
· golf balls. The problem
e giver could ill afford the
After a year of helping Mr.
weather unemployment,
struggles, medical prob-
a job search, Mr. Spies
ear to see him spend $20
lot when there were bills to
edicine and food to buy.

't supposed to work this
ing in Mr. Spies' four-hour
ession had prepared him
e checked his emotion and
a gracious "thank you."
ent to his car and wept.

I saw the excitement in his
face, I realized how important it was
for me to accept that gift," recalled
Mr. Spies. "I realized that this was
more than a charity case — it was a
friendship."

Mr. Spies isn't a social worker or
a full-time staffer with a charitable
group. He's a retired businessman
who volunteers with the St. Vincent
de Paul Society, an international
grass-roots organization that oper-
ates in Catholic parishes to help the
needy.

When he first met Mr. Bilheimer,
Mr. Spies had been needy, too, but in
a very different way. After shuttering
his successful consulting business
and retiring, he occupied himself by
playing golf and dabbling in real es-
tate transactions.

*See FRIENDSHIP Page 6A*

...agencies on Thursday ordered
tient studie · the prescription
painkillers C. srex and Bextra af-
ter recent findings that both drugs
may increase the risk of heart at-
tack and stroke.

The Food and Drug Adminis-
tration also issued an advisory
urging consumers to follow the in-
structions on popular over-the-
counter anti-inflammatory pain
medications such as naproxen,
ibuprofen and aspirin, whose la-
bels limit their use to 10 days with-
out a doctor's approval. Naproxen,
the active ingredient in the popu-
lar painkiller Aleve, has also been
implicated in heart problems in a
National Institutes of Health
study.

Celebrex and Bextra, both
made by Pfizer, belong to a class of
drugs known as cox-2 inhibitors.
Merck pulled a third cox-2 inhibi-
tor, Vioxx, from the market recent-
ly after its users in a clinical trial
showed markedly elevated risks of
heart attack and stroke.

The advisory urges physicians
to be highly selective in writing
prescriptions for Celebrex and
Bextra. Patients at risk of stomach
bleeding, as well as those with a
history of intolerance or who ha-
ven't shown progress with other
pain medications, "may be appro-
priate candidates" for Celebrex
and Bextra, said Dr. John Jenkins,
the director of the FDA's Office of
New Drugs.

An FDA advisory committee
will meet in February on cox-2 in-
hibitors, and no other action is ex-
pected until then. But Dr. Jenkins
said the FDA may consider other
measures involving cox-2 inhibi-
tors and naproxen.

"The data from the controlled
clinical trials is coming out fairly
rapidly, and we have not had an
opportunity to fully evaluate all of
the information," he said.

# nany surfers blasé about blogs

litical fatigue, traffic has slowed to
a crawl on some blogs.

October was the heady heyday,
with nonstop news and plenty of
advertising to go around. Now,
some bloggers are left wondering
whether the success of their sites
was a passing politics-fueled fan-
cy.

Since Nov. 2, business has tum-
bled nearly 40 percent for Blog-
Ads.com, which sells advertising

for about 500 Web sites. Blogs,
formerly updated around-the-
clock, sometimes sit idle for days.
And a few Web scribes are calling
it quits, saying that they and their
readers are pooped.

"People got tired of politics,"
said Vince Leibowitz, a blogger
from Canton, Texas.

The communications consul-
tant had a good thing going with
his accounts of Lone Star State

news and politics. He had reliable
readers, he'd sold a few ads for the
site and some of his posts were
viewed as many as 4,000 times.

But after the campaigns shut
down, so did his blog, called Free
State Standard.

Mr. Leibowitz, who serves as
the Democratic Party chairman in
Van Zandt County, put his blog on

*See BLOGS Page 2A*

theory called "product liability."

If you have taken Bextra and experienced any unusual side effects, you should contact your physician at once. You should also contact an experienced attorney to discuss and protect your legal rights in connection with any harm caused by Bextra.

Go here to learn more about an attorney's role in a product liability case.

Click here to find an experienced product liability attorney near you.

*More information:*
- Why Drugs Get Pulled from the Market
- Pharmaceutical Product Liability

**Sponsored Services**

**Find Lawyers in Your Area**
LegalMatch is the Original Attorney/Client Matching Service. It's Free!

**More Sponsored Services**

**Wills, Divorce, Incorporation & More - Legalzoom:** Fast and friendly legal document service from LegalZoom, the #1 online legal document service.

**Download your Landlord-Tenant and Real Estate Contracts, Agreements and related documents!:** Over 36,000 State specific Legal Forms just seconds away with USlegalforms.com

| **Bextra** | Bextra Overview | Bextra News | Bextra FAQs | Bextra Links | Legal Issues | Get Help Now | Dangerous Products A - Z |
|---|---|---|---|---|---|---|---|
| **FindLaw for the Public** | FindLaw for the Public | Accidents and Injuries | Bankruptcy & Debt | Criminal Law | Divorce & Family Law Center | DUI / DWI | Employee Rights Center | Real Estate Center | More Topics... |

Copyright © 2007 FindLaw. ALL RIGHTS RESERVED  Privacy Policy  Disclaimer        About  Advertise  Blog  Local

**B**

Neurontin News - Findlaw for the Public -    Page 1 of 1



For The Public

http://public.findlaw.com

Wednesday, Mar. 28, 2007

# Neurontin News

### August 2006: An Estimated 300 Lawsuits Filed Over Neurontin
According to a recent USA Today report, an estimated 300 lawsuits have been filed to date, alleging that Neurontin causes suicide or suicide attempt. A first trial may take place in fall 2006. Plaintiffs allege that Neurontin-maker Pfizer Pharmaceuticals failed to disclose the risk of suicide, and are advocating that the FDA require a black-box warning. Pfizer has responded to the allegations, stating that there is no scientific evidence linking Neurontin to suicide. In December 2005, Pfizer changed the Neurontin prescribing information to include "suicide" and "suicide attempt" as infrequent adverse events.

### April 22, 2005: Neurontin Recall for Empty Bottles and Partially-Filled Capsules
Pfizer Pharmaceuticals and the FDA notified healthcare professionals of the voluntary recall of 40,000 bottles (1 lot) of 100 mg capsules of Neurontin. A mechanical error in manufacturing resulted in some bottles containing empty or partially filled capsules. 100 mg strength capsules from lot #15224V - distributed in October and November, 2004 - are included in the recall. The production lot was distributed only in the United States, and no other Neurontin lots were affected. Click here to read more from the FDA.

### July/August 2004: Drug Maker to Pay $430 Million in Fines, Civil Damages
Pharmaceutical manufacturer Warner-Lambert, a subsidiary of Pfizer Pharmaceuticals, agreed to plead guilty and to pay more than $430 million to resolve criminal charges and civil liability in connection with the illegal and fraudulent promotion of unapproved uses for Neurontin. Click here to read more from the FDA.

Copyright © 2007 FindLaw. ALL RIGHTS RESERVED    Privacy Policy   Disclaimer        About FindLaw   Advertise on FindLaw

C

Legal Department
Pfizer Inc
1751 Lake Cook Road
Deerfield, IL 60015
Tel 847 945 5891  Fax 847 945 5882
Email mary.katriadakis@pfizer.com



**Mary Katriadakis**
Litigation

November 14, 2005

Ms. Cynthia Lynch
1817 Dusk Drive
Killeen, TX 76543

Re:     Your Claim

Dear Ms. Lynch:

Your claim has been forwarded to me for handling.  Please be advised that in order for
your claim to be evaluated to determine whether or not settlement is appropriate, the
following information should be forwarded to my attention, at your earliest convenience:

1.  All medical records concerning any medical treatment received from your primary
    care physician, as well as records of any other treating and prescribing physician(s) or
    hospital(s) for *two* years prior to your first prescription of Bextra through the present.
    It is your responsibility to obtain and forward these records to me at the address
    shown above; if it is determined that the records are incomplete or missing, our
    evaluation will be delayed until supplemental records are provided.  Any expenses
    relating to the production of these records are also your responsibility.

2.  The dollar amount being sought in settlement, including copies of all medical and
    hospital bills related to this claim, as well as benefit statements from any insurance
    company or HMO.

Upon receipt of the records described above, they will be evaluated.  You will be
contacted, in writing, at the conclusion of our evaluation.  We will notify you if additional
records are required.

Please be advised that Pfizer's willingness to review this matter should not be considered
an admission of liability, as a waiver of any defenses or rights Pfizer may have in this

Ms. Cynthia Lynch
November 14, 2005
Page Two

matter, or a guarantee of settlement.  If you have any questions, please direct your
inquiries in writing to my attention.

Sincerely,

Mary Katriadakis

/mk

**D**



Pfizer Inc
95 Corporate Drive
Bridgewater, NJ 08807
(800)438-1985

March 13, 2006

Ms. Cynthia Lynch     *MRN: 4433670*
1817 Dusk Drive
Killeen, TX 76543

Dear Ms. Lynch:

Thank you for taking the time to contact Pfizer, Inc., regarding experiences that occured during treatment with NEURONTIN. Please provide the applicable information requested below, so we may be able to obtain further data from the treating or prescribing physician regarding these experiences.

Pfizer, Inc., maintains a medical event database comprised of all reports received from patients, consumers and health professionals. In protecting the public health we, along with global regulators (e.g. US FDA), rely primarily on health professionals to provide follow-up information on the events or symptoms that are reported. The physician's input is, therefore, extremely important as it is used to monitor the safe use of products and to develop accurate prescribing information.

A postage-paid return envelope is enclosed for your convenience. Thank you once again for your cooperation.

Please contact our call center at (800)438-1985 with any questions you may have regarding this correspondence.

Sincerely,

*Lorraine F. Blumetti*

Lorraine Blumetti
Manager US Output/Global Licensed Partner Exchange
Safety Surveillance and Reporting

K0223261

LB/as

If you are not the patient who was treated with  NEURONTIN, please provide:

Patient's Name:_____Address:_____

If you are the patient, by providing your physician's information you are giving him/her permission to forward information regarding your experience with  NEURONTIN to Pfizer, Inc.

Treating or prescribing physician's name: _Jeffrey W Clark_
Address: _Scott & White Temple Clinic_
_2401 South 31st street_      Telephone number: _254-724-2111_
_Temple Texas 76508_

**E**



Professional Sample ◇ 3 Tablets
NDC 0025-1975-99

◇ **BEXTRA**™ 10 mg
valdecoxib tablets

Usual Dosage: See Full Prescribing Information.
Keep this and all medications out of reach of children.
Note to physician: This package is not child resistant.

Store at 25°C (77°F); excursions permitted to 15-30°C
(59-86°F) [see USP Controlled Room Temperature].

Manufactured for: G.D. Searle LLC, a subsidiary of
Pharmacia Corporation
Chicago, IL 60680, USA
Pfizer Inc
New York/NY 10017 USA
By: Searle Ltd.
Caguas, PR 00725

To remove tablets: Push each tablet through foil.
818 761 003                              P01200-4

For more information call      PHARMACIA  *Pfizer*
1-877-825-2100

LOT P200021        EXP 08-04

F



S & W PHARMACY-KILLEEN
2500 CROSS DR
KILLEEN, TX 76543
Caution: Federal Law prohibits transfer of this drug to any person other than for whom prescribed.
(254) 699-1133
Rx# 6086362-09 N
CYNTHIA  LYNCH-ULETT
1817 DUSK DR                          09/24/2004
KILLEEN, TX 76543                     DOB: 12/26/1950
TAKE 1 CAPSULE BY MOUTH DAILY

NEURONTIN 100MG *CAPSULE
PARK
DR. CLARK, JEFFREY WAYNE DO          30 CAP

No refill                                      DAW: 0
                              Tech/RPh: DRP/S&:V
            M

G

Legal Department
Pfizer Inc
1751 Lake Cook Road
Deerfield, IL 60015
Tel 847 945 5891  Fax 847 945 5882
Email mary.katriadakis@pfizer.com



Mary Katriadakis
Litigation

December 1, 2006

Ms. Cynthia Lynch
1817 Dusk Dr.
Killeen, TX  76543

Re: Your Claim

Dear Ms. Lynch:

The records you submitted have been reviewed. This includes medical records from Scott & White Hospital and Clinic, Metroplex Health System, billing statements from Dr. House and Scott & White Hospital and Dallas New articles.

There is reference to treatment with Dr. House and treatment related to rectal bleeding; these records were not received.

The medical records reveal that you have a history of cervical spondylosis, carpal tunnel syndrome, type 2 diabetes, left bundle branch block, left ventricular dyskinesis, ventricular hypertrophy, dyslipidemia and hypertension.

Medication exposure includes: Flexeril, Hydrochlorothiazide, Tylenol, Motrin, Naproxen Neurontin, Potassium, Vicodin and Zocor.

[Ibuprofen, Motrin and Naproxen are classified as nonsteroidal anti-inflammatory drugs (NSAIDs). NSAIDs cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration and perforation of the stomach or intestines, which can be fatal. These events can occur at any time during use and without warning symptoms.]

Following is a chronological summary prepared from the medical records provided:

5/12/2002: Scott & White emergency department record. Ms. Lynch "complains of being knocked to ground by a car, at low speed." Ms. Lynch complains of pain in the head,

1

right elbow, left shoulder and both hands. The accident occurred 3 days prior to presenting to emergency department. **BP- left arm: 187/129. BP- right arm: 179/106.** Diagnoses: Multiple contusions. Plan: Tylenol, Motrin, Vicodin and follow-up with primary care provider. Cervical spine x-rays show early cervical spondylosis.

[High blood pressure results from the tightening of very small arteries called arterioles. Arterioles regulate the blood flow through your body. As these arterioles tighten (or constrict), your heart has to work harder to pump blood through the smaller space, and the pressure inside the vessels grows.

Hypertension stage 1 is a systolic blood pressure of 140-159 with a diastolic of 90-99. Stage 2 is a systolic blood pressure of 160 or higher and diastolic of 100 or higher. Severe hypertension (hypertensive crisis) is a systolic blood pressure of 220 or more and/or a diastolic pressure of 120 or more. Hypertension, especially severe hypertension, causes injury to the blood vessels within the kidney, brain, heart, and eyes.

High blood pressure can affect your health in four main ways:

- **Hardening of the arteries.** Pressure inside your arteries can cause the muscles that line the walls of the arteries to thicken. Thickening causes the arteries to narrow. A heart attack or stroke can occur if a blood clot blocks blood flow to your heart or brain.

- **Enlarged heart.** High blood pressure increases the amount of work for your heart. Like any heavily exercised muscle in your body, your heart grows bigger [ventricular hypertrophy]. The bigger your heart is, the less able it is to maintain proper blood flow [dyskinesis]. As a result, you feel weak and tired and are not able to exercise or perform physical activities. Your heart has begun to fail. Without treatment, your heart failure will only get worse.

- **Kidney damage.** Prolonged high blood pressure can damage your kidneys if the arteries supplying your kidneys with blood are affected.

- **Eye damage.** If you have diabetes, high blood pressure can cause the tiny capillaries in the retina of your eye to bleed. This condition, called retinopathy, can lead to blindness].

6/1/2002: Scott & White emergency room record [summarized]. Evaluated for right arm and neck pain from a fall. Discharged home on Motrin. [It is noted that the date of birth on this record is listed as 12/26/1980 with an age of 21].

6/11/2002: Prescription for Ibuprofen 800mg. Directions are to take one tablet every 6-8 hours as needed.

5/10/2003: Office visit with Scott & White neurology clinic [summarized]. Consult for radiculopathy. Ms. Lynch complains of chronic numbness and tingling in the right arm and hands. BP: 191/101.

7/30/2003: Scott & White neurology clinic [summarized]. Seen for chronic neck, shoulder and arm pain.

9/11/2003: Scott & White radiology report of CT head. The report describes "white matter that is consistent with moderate microvascular ischemic disease and can be seen in patient with diabetes and hypertension." Impression: 1) No acute intracranial abnormalities have been demonstrated; and 2) moderate chronic microvascular ischemic disease as described above. [hypertension can cause injury to the blood vessels within brain].

9/23/2003: Scott & White Internal Medicine note. Seen for follow-up of blood pressure. Diagnoses are hypertension and left bundle branch block (LBBB). It is unknown if the LBBB is new secondary to no prior ECG for comparison. Additional testing and follow-up is ordered and Hydrochlorothiazide is prescribed.

[Left bundle branch block (LBBB) is a cardiac conduction abnormality seen on the electrocardiogram (ECG). In this condition, activation of the left ventricle is delayed, which results in the left ventricle contracting later than the right ventricle. Among the causes of LBBB are: Hypertension, acute myocardial infarction and extensive cases of coronary artery disease].

11/3/2003: Scott & White Temple Clinic note [summarized]. BP: 160/100. Ms. Lynch is taking Hydrochlorothiazide for hypertension. "She is now on 50 mg a day and 10mEq of potassium b.i. d. She admits to being very stressed." "She has septal dyskinesia on an echocardiogram." Abnormal laboratory values are Cholesterol 277 [normal range 170-200], triglycerides 155 [normal range < 150], HDL 43 [normal range > 50] and LDL 203 [normal range < 150]. Fasting blood sugar was over 170 [normal range 70-110]. Assessment: 1) Suspect type 2 diabetes mellitus; 2) elevated blood pressure, suspect essential hypertension; and 3) abnormal echocardiogram and abnormal ECG. The notes report that the hypertension is poorly controlled and dyslipidemia is diagnosed. Zocor and a beta blocker was added to Ms. Lynch's medication regeim.

12/10/2003: Scott & White Temple Clinic note [summarized]. Assessment: 1) Probably abnormal dipyridamole thallium; 2) hypertension; 3) hyperlipidemia; 4) hyperglycemia; 5) carpal tunnel syndrome; 6) health maintenance; and 7) obesity.

5/18/2004: Metroplex Health System emergency room record [summarized]. Treated for Abdominal pain, vomiting and diarrhea. Diabetes Mellitus is noted. BP: 180/100, P: 118 and T: 99.3. Hem AIC 11.1 [normal range 4.2-5.8]. Glucose 236 [normal range 70-110].

8/5/2004: Office visit with Scott & White neurology clinic [summarized]. Seen for chronic shoulder, neck and some occipital discomfort. "She recalls only trying Flexeril

3

and Naproxen in the past, with no relief whatsoever." Impression: Chronic mechanical pain. Plan: 1) Follow-up with physical medicine and rehabilitation; 2) restart her antihypertensive; 3) trial of Neurontin; and 4) stressed close follow-up with her primary care physician to assess and treat her vascular risk factors, including elevated blood pressure.

Documentation supporting the allegations that you experienced "heart damage" and "saw blood in your bowel movements." secondary to a brief exposure to Bextra is not found in the medical record. Documentation in the medical record reveals numerous risk factors for cardiovascular problems including long standing severe hypertension and diabetes. In regards to the complaint of bleeding with bowel movements, there were no notes related to this complaint and the record identifies exposure to numerous other NSAIDs. Medical records do not establish any link between your reported symptoms and exposure to Bextra.

Please be advised that Bextra is indicated for the relief of signs and symptoms of osteoarthritis, rheumatoid arthritis and primary dysmenorrhea. GI ulceration, bleeding, perforation, abnormal ECG, heart block, myocardial infarction, myocardial ischemia, aggravated hypertension, arrhythmia and cardiomyopathy are possible adverse effect with Bextra; for which Searle/Pharmacia/Pfizer warns.

While we sympathize with your experience, it is not Searle's/Pharmacia's/Pfizer's policy to reimburse individuals for experiences about which we warn. Accordingly, it is Searle's/Pharmacia's/Pfizer's position that it has no liability relative to your claim, and therefore the claim is denied.

Sincerely,

Mary Katriadakis

4

**H**

# DEFENDANT IS IN POSESSION WITH THESE RECORDS

I



J

CIVIL PRACTICE & REMEDIES CODE

CHAPTER 82. PRODUCTS LIABILITY


§ 82.001. DEFINITIONS.  In this chapter:
        (1)  "Claimant" means a party seeking relief, including
a plaintiff, counterclaimant, or cross-claimant.
        (2)  "Products liability action" means any action
against a manufacturer or seller for recovery of damages arising
out of personal injury, death, or property damage allegedly caused
by a defective product whether the action is based in strict tort
liability, strict products liability, negligence,
misrepresentation, breach of express or implied warranty, or any
other theory or combination of theories.
        (3)  "Seller" means a person who is engaged in the
business of distributing or otherwise placing, for any commercial
purpose, in the stream of commerce for use or consumption a product
or any component part thereof.
        (4)  "Manufacturer" means a person who is a designer,
formulator, constructor, rebuilder, fabricator, producer,
compounder, processor, or assembler of any product or any component
part thereof and who places the product or any component part
thereof in the stream of commerce.

Added by Acts 1993, 73rd Leg., ch. 5, § 1, eff. Sept. 1, 1993.


§ 82.002. MANUFACTURER'S DUTY TO INDEMNIFY.  (a) A
manufacturer shall indemnify and hold harmless a seller against
loss arising out of a products liability action, except for any loss
caused by the seller's negligence, intentional misconduct, or other
act or omission, such as negligently modifying or altering the
product, for which the seller is independently liable.
        (b)  For purposes of this section, "loss" includes court
costs and other reasonable expenses, reasonable attorney fees, and
any reasonable damages.
        (c)  Damages awarded by the trier of fact shall, on final
judgment, be deemed reasonable for purposes of this section.
        (d)  For purposes of this section, a wholesale distributor or
retail seller who completely or partially assembles a product in
accordance with the manufacturer's instructions shall be
considered a seller.
        (e)  The duty to indemnify under this section:
            (1)  applies without regard to the manner in which the
action is concluded;  and
            (2)  is in addition to any duty to indemnify

established by law, contract, or otherwise.

(f)  A seller eligible for indemnification under this
section shall give reasonable notice to the manufacturer of a
product claimed in a petition or complaint to be defective, unless
the manufacturer has been served as a party or otherwise has actual
notice of the action.

(g)  A seller is entitled to recover from the manufacturer
court costs and other reasonable expenses, reasonable attorney
fees, and any reasonable damages incurred by the seller to enforce
the seller's right to indemnification under this section.

Added by Acts 1993, 73rd Leg., ch. 5, § 1, eff. Sept. 1, 1993.


§ 82.003.  LIABILITY OF NONMANUFACTURING SELLERS.  (a) A
seller that did not manufacture a product is not liable for harm
caused to the claimant by that product unless the claimant proves:

(1)  that the seller participated in the design of the
product;

(2)  that the seller altered or modified the product
and the claimant's harm resulted from that alteration or
modification;

(3)  that the seller installed the product, or had the
product installed, on another product and the claimant's harm
resulted from the product's installation onto the assembled
product;

(4)  that:

(A)  the seller exercised substantial control
over the content of a warning or instruction that accompanied the
product;

(B)  the warning or instruction was inadequate;
and

(C)  the claimant's harm resulted from the
inadequacy of the warning or instruction;

(5)  that:

(A)  the seller made an express factual
representation about an aspect of the product;

(B)  the representation was incorrect;

(C)  the claimant relied on the representation in
obtaining or using the product;  and

(D)  if the aspect of the product had been as
represented, the claimant would not have been harmed by the product
or would not have suffered the same degree of harm;

(6)  that:

(A)  the seller actually knew of a defect to the
product at the time the seller supplied the product;  and

(B)  the claimant's harm resulted from the defect;
or

(7)  that the manufacturer of the product is:

(A)  insolvent;  or

              (B)  not subject to the jurisdiction of the court.
     (b)  This section does not apply to a manufacturer or seller whose liability in a products liability action is governed by Chapter 2301, Occupations Code.  In the event of a conflict, Chapter 2301, Occupations Code, prevails over this section.

Added by Acts 2003, 78th Leg., ch. 204, § 5.02, eff. Sept. 1, 2003.


    § 82.004.  INHERENTLY UNSAFE PRODUCTS.  (a) In a products liability action, a manufacturer or seller shall not be liable if:
         (1)  the product is inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community;  and
         (2)  the product is a common consumer product intended for personal consumption, such as sugar, castor oil, alcohol, tobacco, and butter, as identified in Comment i to Section 402A of the Restatement (Second) of Torts.
     (b)  For purposes of this section, the term "products liability action" does not include an action based on manufacturing defect or breach of an express warranty.

Added by Acts 1993, 73rd Leg., ch. 5, § 1, eff. Sept. 1, 1993.


    § 82.005.  DESIGN DEFECTS.  (a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:
         (1)  there was a safer alternative design;  and
         (2)  the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.
     (b)  In this section, "safer alternative design" means a product design other than the one actually used that in reasonable probability:
         (1)  would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility;  and
         (2)  was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.
     (c)  This section does not supersede or modify any statute, regulation, or other law of this state or of the United States that relates to liability for, or to relief in the form of, abatement of nuisance, civil penalties, cleanup costs, cost recovery, an injunction, or restitution that arises from contamination or pollution of the environment.
     (d)  This section does not apply to:

        (1)  a cause of action based on a toxic or environmental tort as defined by Sections 33.013(c)(2) and (3);  or
        (2)  a drug or device, as those terms are defined in the federal Food, Drug, and Cosmetic Act (21 U.S.C. Section 321).
    (e)  This section is not declarative, by implication or otherwise, of the common law with respect to any product and shall not be construed to restrict the courts of this state in developing the common law with respect to any product which is not subject to this section.

Added by Acts 1993, 73rd Leg., ch. 5, § 1, eff. Sept. 1, 1993.


    § 82.006.  FIREARMS AND AMMUNITION.  (a) In a products liability action brought against a manufacturer or seller of a firearm or ammunition that alleges a design defect in the firearm or ammunition, the burden is on the claimant to prove, in addition to any other elements that the claimant must prove, that:
        (1)  the actual design of the firearm or ammunition was defective, causing the firearm or ammunition not to function in a manner reasonably expected by an ordinary consumer of firearms or ammunition;  and
        (2)  the defective design was a producing cause of the personal injury, property damage, or death.
    (b)  The claimant may not prove the existence of the defective design by a comparison or weighing of the benefits of the firearm or ammunition against the risk of personal injury, property damage, or death posed by its potential to cause such injury, damage, or death when discharged.

Added by Acts 1993, 73rd Leg., ch. 5, § 1, eff. Sept. 1, 1993.


    § 82.007.  MEDICINES.  (a) In a products liability action alleging that an injury was caused by a failure to provide adequate warnings or information with regard to a pharmaceutical product, there is a rebuttable presumption that the defendant or defendants, including a health care provider, manufacturer, distributor, and prescriber, are not liable with respect to the allegations involving failure to provide adequate warnings or information if:
        (1)  the warnings or information that accompanied the product in its distribution were those approved by the United States Food and Drug Administration for a product approved under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. Section 301 et seq.), as amended, or Section 351, Public Health Service Act (42 U.S.C. Section 262), as amended;  or
        (2)  the warnings provided were those stated in monographs developed by the United States Food and Drug Administration for pharmaceutical products that may be distributed without an approved new drug application.

(b)  The claimant may rebut the presumption in Subsection (a) as to each defendant by establishing that:
(1)  the defendant, before or after pre-market approval or licensing of the product, withheld from or misrepresented to the United States Food and Drug Administration required information that was material and relevant to the performance of the product and was causally related to the claimant's injury;
(2)  the pharmaceutical product was sold or prescribed in the United States by the defendant after the effective date of an order of the United States Food and Drug Administration to remove the product from the market or to withdraw its approval of the product;
(3) (A) the defendant recommended, promoted, or advertised the pharmaceutical product for an indication not approved by the United States Food and Drug Administration;
(B)  the product was used as recommended, promoted, or advertised;  and
(C)  the claimant's injury was causally related to the recommended, promoted, or advertised use of the product;
(4) (A) the defendant prescribed the pharmaceutical product for an indication not approved by the United States Food and Drug Administration;
(B)  the product was used as prescribed;  and
(C)  the claimant's injury was causally related to the prescribed use of the product;  or
(5)  the defendant, before or after pre-market approval or licensing of the product, engaged in conduct that would constitute a violation of 18 U.S.C. Section 201 and that conduct caused the warnings or instructions approved for the product by the United States Food and Drug Administration to be inadequate.

Added by Acts 2003, 78th Leg., ch. 204, § 5.02, eff. Sept. 1, 2003.


§ 82.008. COMPLIANCE WITH GOVERNMENT STANDARDS.  (a) In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.
(b)  The claimant may rebut the presumption in Subsection (a) by establishing that:
(1)  the mandatory federal safety standards or regulations applicable to the product were inadequate to protect

the public from unreasonable risks of injury or damage;  or
        (2)  the manufacturer, before or after marketing the
product, withheld or misrepresented information or material
relevant to the federal government's or agency's determination of
adequacy of the safety standards or regulations at issue in the
action.
        (c)  In a products liability action brought against a product
manufacturer or seller, there is a rebuttable presumption that the
product manufacturer or seller is not liable for any injury to a
claimant allegedly caused by some aspect of the formulation,
labeling, or design of a product if the product manufacturer or
seller establishes that the product was subject to pre-market
licensing or approval by the federal government, or an agency of the
federal government, that the manufacturer complied with all of the
government's or agency's procedures and requirements with respect
to pre-market licensing or approval, and that after full
consideration of the product's risks and benefits the product was
approved or licensed for sale by the government or agency.  The
claimant may rebut this presumption by establishing that:
        (1)  the standards or procedures used in the particular
pre-market approval or licensing process were inadequate to protect
the public from unreasonable risks of injury or damage;  or
        (2)  the manufacturer, before or after pre-market
approval or licensing of the product, withheld from or
misrepresented to the government or agency information that was
material and relevant to the performance of the product and was
causally related to the claimant's injury.
        (d)  This section does not extend to manufacturing flaws or
defects even though the product manufacturer has complied with all
quality control and manufacturing practices mandated by the federal
government or an agency of the federal government.
        (e)  This section does not extend to products covered by
Section 82.007.

Added by Acts 2003, 78th Leg., ch. 204, § 5.02, eff. Sept. 1,
2003.

not absolve the manufacturer of responsibility, because the failure to warn was a cause of the accident [General Motors Corp. v. Saenz, 829 S.W.2d 230, 237 (Tex. App.—Corpus Christi 1991), rev'd on other grounds, 873 S.W.2d 353, 356 (Tex. 1993)].

### [d]—Proof of Product Supplier's Knowledge

A product supplier's knowledge or ability to foresee risk of harm to product users may be established by evidence of warnings provided by other manufacturers or suppliers of similar products. In one case, for example, the defendant was held liable for gross negligence in ignoring the medical literature available at the time the injury-causing drug was manufactured and in failing to attach a warning. In this case, the plaintiff proved that The manufacturer's warning was inadequate by producing evidence of the warnings attached to similar drugs [American Cyanamid Co. v. Frankson, 732 S.W.2d 648, 657–660 (Tex. App.—Corpus Christi 1987, ref. n.r.e.)—defendant's own post-injury warning was also admissible in support of exemplary damage claim].

Evidence of accidents involving the defendant manufacturer's product under circumstances similar to those of the plaintiff's accident is admissible to show that the defendant knew or should have known of the hazards associated with the product. Such evidence is also relevant to the appropriateness of any warning given, and whether the manufacturer was so indifferent to the danger as to be liable for exemplary damages [John Deere Co. v. May, 773 S.W.2d 369, 372–373 (Tex. App.—Waco 1989, den.)—evidence of other instances in which defendant's bulldozers spontaneously shifted gear while their engines were running].

Evidence that a manufacturer issued a warning about a product's dangerous characteristics *after* the plaintiff sustained an injury resulting from that danger may be excludable as evidence of "subsequent repairs," but only if the evidence is offered only to prove the manufacturer's negligence or other "fault." Evidence of post-accident warnings, like evidence of subsequent repairs generally, is admissible to rebut testimony that a product could not be improved by issuance of a warning or that a different design was not practical, or to show that the defect could have been remedied [Howard v. Faberge, Inc., 679 S.W.2d 644, 647 (Tex. App.—Houston [1st Dist.] 1984, ref.n.r.e.)].

### [e]—Adequacy of Warning

When a product supplier has a duty to warn, the supplier may escape liability only if the supplier gives a warning that is "adequate." The duty to warn requires The manufacturer to warn with a degree of intensity that would cause a reasonable person to exercise caution commensurate with the potential danger. A warning is considered *adequate* if it is in a form that reasonably could be

(Matthew Bender & Co., Inc.)

§ 320.03[5][c]          PRODUCTS LIABILITY                          320-32

### [c]—Time When Product Supplier's Knowledge of Foreseeability Relevant

#### [i]—Knowledge After Sale Irrelevant

A product is defective because of a failure to warn only if the product's dangers were known or foreseeable at the time the product was sold [see, e.g., USX Corp. v. Salinas, 818 S.W.2d 473, 484 (Tex. App.—San Antonio 1991, den.)]. Therefore, a product supplier has no common-law duty to warn of defects that become known after the sale of the product unless the manufacturer regains some significant degree of control over the product [Arkwright-Boston Mfrs. Mut. v. Westinghouse Elec., 844 F.2d 1174, 1185 (5th Cir. [Tex.] 1988]. For example, one court of appeals held that a tractor manufacturer did not have a duty to warn its customers about a rollover risk associated with its vehicles, because the hazard was discovered after the time of manufacture and the manufacturer never regained control of the tractors or otherwise assumed responsibility for curing their defect [Dion v. Ford Motor Co., 804 S.W.2d 302, 310–312 (Tex. App.—Eastland 1991, den.); see Syrie v. Knoll Intern., 748 F.2d 304, 310–312 (5th Cir. [Tex.] 1984—manufacturer has no duty to warn about or to recall product for which safer design is developed following manufacture and sale of product, at least not when manufacturer has lost control of product in marketing chain; see also Bell Helicopter Co. v. Bradshaw, 594 S.W.2d 519, 530–531 (Civ. App.—Corpus Christi 1979, ref. n.r.e.)—manufacturer who retained significant degree of control over product after it left manufacturer's hands was strictly liable for defective design of product].

#### [ii]—Foreseeable Customer Modifications Distinguished

Although a product manufacturer generally does not have a duty to warn of information or developments occurring after the sale of the product [see [i], above], this does not mean that a product supplier may ignore facts about how customers are likely to use or to modify the product after it is sold. If a product supplier knows, at the time of sale, that customers are likely to alter or to modify the product in a particular way that makes it dangerous, the product supplier does have a duty to warn. In one case, for example, a manufacturer of a truck cab and chassis was held liable for failing to warn of the danger of overloading the truck after it was modified by the installation of a water tank that, when fully loaded, caused the vehicle to exceed its maximum gross vehicle weight. The manufacturer was liable because the modifications to the bare cab and chassis were foreseeable and expected. The manufacturer had a duty to warn users of the truck not to modify it so that it could carry a heavier load than it was designed to carry, and to warn users of the dangers of overloading. Moreover, the modification by a third party did

manufacturer was not liable for failing to install a backup buzzer on a truck that was modified after sale by the installation of a beer storage unit that blocked the driver's rearview mirror. In so holding, the court ruled that the fact finder must look at these three factors when "determining the responsibility for the absence of a safety device when a finished product is the result of substantial work done by more than one party" [Elliott v. Century Chevrolet Co., 597 S.W.2d 563, 564 (Civ. App.—Fort Worth 1980, ref. n.r.e.)]. However, the second and majority approach for measuring the continued liability of the original product supplier after the product is modified concentrates on whether the modifications or alterations (and the risks attendant to such modifications or alterations) were foreseeable by the original product supplier [*see*Sharp v. Chrysler Corporation, 432 S.W.2d 131, 136 (Civ. App.—Houston [14th Dist.] 1968, ref. n.r.e.)].

## § 320.07  Causation

In addition to proving that a product is defective, the plaintiff must also establish that the harm was caused by the defect. Generally, the plaintiff must prove that the defect was the actual or "producing cause" of the injury [General Motors Corp. v. Hopkins, 548 S.W.2d 344, 351(Tex. 1977); *see* Ahlschlager v. Remington Arms Co., Inc., 750 S.W.2d 832, 835(Tex. App.—Houston [14th Dist.] 1988, den.)—defendant who contended that conduct of third party was sole cause of plaintiff's injuries was entitled to jury instruction on "sole cause"]. A *producing cause* is "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages" of which the plaintiff complains [Rourke v. Garza, 530 S.W.2d 794, 801 (Tex. 1975); *see also* Gutierrez v. Dresser Industries, Inc., 769 S.W.2d 704, 705–706 (Tex. App.—Corpus Christi 1989, no writ)—tool's defective design held not to be producing cause of worker's injuries, based on expert testimony that even if tool had been designed properly, injury still would have occurred]. The defect need not have caused the accident or other incident giving rise to the injury, if the defect caused the injury itself [Sipes v. General Motors Corp., 946 S.W.2d 143, 154 (Tex. App.—Texarkana 1997, no writ)—allegedly defective airbag could have caused injuries, not collision].

There may be more than one producing cause that contributes to the plaintiff's injury. As long as the product defect was *a* producing cause, it is not necessary to establish that the defect was the *only* producing cause [Simms v. Southwest Texas Methodist Hospital, 535 S.W.2d 192, 197 (Civ. App.—San Antonio 1976, ref. n.r.e.)].

On the other hand, to be considered a producing cause of harm, the defect must have been a "substantial factor" in bringing about the harm. A defect

§ 320.03[5][f]    PRODUCTS LIABILITY    320–34

expected to catch the attention of a reasonably prudent person in the circumstances of its use. The content of the warning must be comprehensible to the average user, and it must convey, to a reasonably prudent person, a fair indication of the nature and extent of the danger involved. Mere directions for use do not necessarily satisfy the duty to warn [Bituminous Casualty Corp. v. Black & Decker Mfg. Co., 518 S.W.2d 868, 872–873 (Civ. App.—Dallas 1974, ref. n.r.e.)].

### [f]—Role of Intermediary in Giving Warning



Generally, warnings must be given to the ultimate user or consumer of the product. Thus, for example, when a supplier provides the product in containers that can be expected to reach the employees of the buyer who use the product, adequate warnings and instructions must be placed on the containers. However, there are several exceptions to this general rule that permit delegation of the duty to warn [Humble Sand & Gravel, Inc. v. Gomez, 48 S.W.3d 487, 494–495 (Tex. App.—Texarkana 2001, pet. filed)].

When a product is not marketed directly to the public, but only to professionals who serve the public, such as physicians, the adequacy of the warning is measured by the needs and knowledge of the professionals. A warning will be sufficient so long as it is adequate for the limited class of professionals [Martinez v. Dixie Carriers, Inc., 529 F.2d 457, 465–466 (5th Cir. [Tex.] 1976; Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1275–1276(5th Cir. [Tex.] 1974)]. Furthermore, even if the warning could be considered inadequate to a professional group as a whole, if a particular learned intermediary already knows of the possible risks involved in using the product and chooses to use it, the adequacy of the warning will not be a producing cause of the injuries [see Stewart v. Janssen Pharmaceutica, Inc., 780 S.W.2d 910, 912 (Tex. App.—El Paso 1989, den.)—because anesthesiologist knew of risks of specific anesthesia and nevertheless chose to use it, drug manufacturer could not be held liable for patient's resulting injuries based on inadequacy of warning].

Under the "learned intermediary" doctrine, when a drug is marketed through a doctor, the doctor-patient relationship relieves the drug manufacturer of the obligation to warn the ultimate consumer of risks associated with the product. Under these circumstances, the duty to warn extends only to the doctor, and the manufacturer may not be held liable to the ultimate consumer for failing to warn even if the doctor, in fact, does not exercise independent professional judgment regarding the use of the drug [Hurley v. Lederle Lab. Div. of American Cyanamid, 863 F.2d 1173, 1179 (5th Cir. [Tex.] 1989)]. The doctor assumes the duty to warn the patient of the dangers associated with the prescribed drug [Rolen v. Burroughs Wellcome Co., 856 S.W.2d 607, 609 (Tex. App.—Waco 1993, den.)]. Of course, the manufacturer may still incur liability for injuries to the consumer if its warning to the professional was inadequate

IN THE LANGUAGE
OF THE COURT

Plaintiff introduced substantial evidence that his injuries were caused by defective design and construction of the Shopsmith. * * * The jury could therefore reasonably have concluded that the manufacturer negligently constructed the Shopsmith. The jury could also reasonably have concluded that statements in the manufacturer's brochure were untrue, that they constituted express warranties, and that plaintiff's injuries were caused by their breach.

* * * *

[But] to impose strict liability on the manufacturer under the circumstances of this case, it was not necessary for plaintiff to establish an express warranty * * * . A *manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.* * * * [Emphasis added.]

* * * *

* * * The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers * * * rather than by the injured persons who are powerless to protect themselves.

DECISION
AND REMEDY

*The Supreme Court of California upheld the jury verdict for the plaintiff. The manufacturer was held strictly liable in tort for the harm caused by its unsafe product.*

## THE REQUIREMENTS FOR STRICT PRODUCT LIABILITY

As mentioned in Chapter 1, the courts often look to the *Restatements of the Law* for guidance, even though the *Restatements* are not binding authorities. Section 402A of the *Restatement (Second) of Torts* indicates how it was envisioned that the doctrine of strict product liability should be applied. This *Restatement* was issued in 1964, and during the decade following its release it became a widely accepted statement of the liabilities of sellers of goods (including manufacturers, processors, assemblers, packagers, bottlers, wholesalers, distributors, retailers, and lessors). Section 402A reads as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property, if
  (a) the seller is engaged in the business of selling such a product, and
  (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although
  (a) the seller has exercised all possible care in the preparation and sale of his product, and
  (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The bases for an action in strict liability as set forth in Section 402A of the *Restatement (Second) of Torts*, and as the doctrine came to be commonly applied, can be summarized as a series of six requirements, which are listed here. Depending on the jurisdiction, if these requirements were met, a manufacturer's liability to an injured party could be virtually unlimited.[5]

1. The product must be in a defective condition when the defendant sells it.
2. The defendant must normally be engaged in the business of selling (or otherwise distributing) that product.
3. The product must be unreasonably dangerous to the user or consumer because of its defective condition (in most states).
4. The plaintiff must incur physical harm to self or property by use or consumption of the product.
5. The defective condition must be the proximate cause of the injury or damage.
6. The goods must not have been substantially changed from the time the product was sold to the time the injury was sustained.

Thus, under these requirements, in any action against a manufacturer, seller, or lessor, the plaintiff

---

5. In a number of states, *statutes of repose* (discussed later in this chapter) place a limit on the time period within which product-liability actions may be brought.

### Drug Manufacturer's Duty to Warn

A drug manufacturer has a duty to warn of side effects of a drug when such effects are understood to occur, but is not expected to warn of unknown dangers. Often the manufacturer discharges this duty by providing the necessary information to the patient's prescribing physician or to the pharmacist. The drug manufacturer is considered an expert in its field, and as such it has a continuing duty to keep abreast of knowledge regarding its products and take all reasonable steps to update medical professionals on their potential adverse effects. There is no duty to warn of possible reactions in unusually susceptible consumers, however, but just because a reaction is rare does not mean the manufacturer has no duty to warn about it or that the persons experiencing the reaction are unusually susceptible.

### Time Lapse Issues

In some drug-related injury cases, the plaintiff will not be able to identify the precise manufacturer or supplier of the defective product because enough time has elapsed that the evidence is no longer available, such as in cases involving drugs ingested during pregnancy. In those cases, the damages may not become apparent until the children are grown. Asbestos-exposure cases are another example of this time lapse problem. In such cases, a variety of theories is available to shift the burden to the potential defendants to prove that they could not be responsible, or to allocate the damages among a number of potentially liable manufacturers.

### The National Childhood Vaccine Injury Act

The National Childhood Vaccine Injury Act was established to provide a remedy to persons who have been injured as a result of childhood immunizations, so that they do not have to engage in lengthy and expensive litigation. Lawyers have an obligation to inform their clients who consult them about such injuries of the possibility of recovering under the Act.

### Getting Legal Help for a Defective Product Injury

Product liability actions are often quite complex, and establishing legal fault often requires the assistance and testimony of experts. There are several theories under which a plaintiff might bring a claim, and several defenses that might defeat such a claim. Additionally, every state has its own laws and specific statutes that will affect a product liability action. It is therefore important to consult an experienced attorney if you or a loved one suffers injury caused by a potentially defective product.

Go here to learn more about an attorney's role in a product liability case.

Click here to find an experienced product liability attorney near you.

**Sponsored Services**

K

Bextra - News - Findlaw for the Public -

FindLaw | For the Public | For Small Business | For Legal Professionals | Find a Lawyer

Search Public 

# FindLaw
For The Public

| HOME | ACCIDENTS & INJURIES | BANKRUPTCY & DEBT | CRIMINAL LAW | DIVORCE & FAMILY LAW | DUI DWI | EMPLOYEE RIGHTS | REAL ESTATE | BEX |

Bextra Overview | Bextra News | Bextra FAQs | Bextra Links | Legal Issues | Get Help Now | Dangerous Products A - Z

**Browse Bextra**

**Bextra Overview**
**Bextra News**
**Bextra FAQs**
**Bextra Links**
**Legal Issues**
**Get Help Now**
**Dangerous**
  **Products A - Z**

FindLaw > Public > Accidents and Injuries > Bextra
My current location: Dallas, TX | Change location
✉ Email | 🖨 Print | 🔖 Bookmark

**Featured Attorneys**

**Butler, Wooten & Fryhofer, LLP**
*Nationwide* - Reputation, Experience & Dedication. Call 1-800-233-4086 or 1-800-242-2962.

**Matthews & Associates**
*Nationwide* - Board Certified Lawyers. "Passion for Justice; Loyalty to our Clients." (888) 222-7052

**Find A Lawyer**

**Select type of practice:**
Products Liability L

**Enter City or Zip:**
Dallas
Texas

[ Find ]

Browse Lawyers by State
Browse by Type of Practice
Submit Your Legal Issue

# Bextra - News

## April 7, 2005: Pfizer Voluntarily Withdraws Bextra

On April 7th, 2005, the Food and Drug Administration (FDA) announced that it has asked Pfizer, Inc. to voluntarily withdraw Bextra (valdecoxib) from the U.S. market. Pfizer agreed to suspend sales and marketing of Bextra in the U.S., pending further discussions with the FDA.

**Sponsored Services**

**Personal Injury Money**
TotalInjury.com - How Much is Your Personal Injury Case Worth? Personal Injury Info.

**More Sponsored Services**

**Wills, Divorce, Incorporation & More - Legalzoom:** Fast and friendly legal document service from LegalZoom, the #1 online legal document service.

**Download your Landlord-Tenant and Real Estate Contracts, Agreements and related documents!:** Over 36,000 State specific Legal Forms just seconds away with USlegalforms.com

**Search**

**Enter Search Term:**

Public

[ Search ]

**Message Boards**

**Select a Board:**
Popular Topics

[ Go ]

| Bextra | Bextra Overview | Bextra News | Bextra FAQs | Bextra Links | Legal Issues | Get Help Now | Dangerous Products A - Z |

| FindLaw | FindLaw | Accidents | Bankruptcy | Criminal | Divorce & Family | DUI / | Employee | Real | More |

Accutane, Baycol, Bextra, Ephedra, Meridia, Ortho Evra, Prempro, ReNu, Serzone, Silico...   Page 1 of 3

FindLaw | For the Public | For Small Business | For Legal Professionals | Find a Lawyer

Search Public 

# FindLaw
For The Public

| HOME | ACCIDENTS & INJURIES | BANKRUPTCY & DEBT | CRIMINAL LAW | DIVORCE & FAMILY LAW | DUI DWI | EMPLOYEE RIGHTS | REAL ESTATE | DANGER PROD |

| Legal Issues | FAQ | Dangerous Products A - Z | Recalls | Get Help Now | Resources |

FindLaw > Public > Accidents and Injuries > Dangerous Products > Dangerous Products A - Z
My current location: Dallas, TX | **Change location**
✉ **Email**    🖨 **Print**    🗀 **Bookmark**

**Browse Dangerous Products**

Legal Issues
FAQ
Dangerous
  Products A - Z
  Accutane
  Acetaminophen
  Ambien
  Aredia
  Baycol
  Benzene
  Beryllium
  Bextra
  Celebrex
  Celexa
  Cialis
  Crestor
  Darvon / Darvocet
  Depo-Provera
  Diclofenac
  Drug-Coated Stents
  Duragesic Patch
  Effexor
  Ephedra
  Evista
  Fluvoxamine
  Fosamax
  Gleevec
  Guidant
  Ketek
  LASIK Eye Surgery
  Lead Poisoning
  Levitra
  Lexapro
  Light Cigarettes
  Medtronic
    Defibrillator
  Meridia
  Mesothelioma -
    Asbestos
  Mirapex
  Motor Vehicle
    Defects
  Neurontin
  Ortho Evra
  Paxil
  Perchlorate
  Popcorn Lung Illness
  Prempro

### Featured Attorneys

**Butler, Wooten & Fryhofer, LLP**
*Nationwide* - Reputation, Experience & Dedication. Call 1-800-233-4086 or 1-800-242-2962.

**Matthews & Associates**
*Nationwide* - Board Certified Lawyers. "Passion for Justice; Loyalty to our Clients." (888) 222-7052

# Defective and Dangerous Products A to Z

To begin, please select an item from the list below or from the "Browse" box on the left.

- Accutane
- Acetaminophen
- Ambien
- Aredia
- Baycol
- Benzene
- Beryllium
- Bextra
- Celebrex
- Celexa
- Cialis
- Crestor
- Darvon / Darvocet
- Depo-Provera
- Diclofenac
- Drug-Coated Stents
- Duragesic Patch
- Effexor
- Ephedra
- Evista
- Fluvoxamine
- Fosamax
- Gleevec
- Guidant Defibrillator / Pacemaker
- Ketek

- Medtronic Defibrillator
- Meridia
- Mesothelioma - Asbestos
- Mirapex
- Motor Vehicle Defects
- Neurontin
- Ortho Evra Patch
- Paxil
- Perchlorate
- Popcorn Lung Illness
- Prempro
- Promethazine HCl
- Prozac
- ReNu with MoistureLoc
- Risperdal
- Seroquel
- Serzone
- Silicosis & Silica
- Spinach Recall and E. coli
- Symbyax
- Tamiflu
- Teflon
- Tequin
- Triaminic Vapor Patch
- Viagra

Defective and Dangerous Products - Proving Fault - Findlaw for the Public -                    Page 1 of 2



**FindLaw**
For The Public

http://public.findlaw.com
Wednesday, Mar. 28, 2007

# Defective and Dangerous Products - Proving Fault

If you have been injured by a defective or dangerous product, you may have an easier time recovering compensation for your injuries than those who are injured in other ways. This is because special rules and theories of recovery have been developed in the area of product liability law. A person may recover against a manufacturer or seller based on one or more of the following theories: strict liability; negligence; and, breach of warranty, depending on the law in the applicable state. The most commonly asserted theory, strict liability, is discussed here.

**Strict Liability Defined**

Ordinarily, to hold someone liable for your injuries, you must show that they were careless, that is, negligent, and that their carelessness led to the your injuries. With products sold to the general public, however, it would be extremely difficult and prohibitively expensive for one individual to have to show how and when a manufacturer was careless in making a particular product. Neither can the consumer be expected to prove whether the seller or renter of a product had a proper system for checking for manufacturer's defects, or whether the seller caused the defect after receiving the product from the manufacturer. Finally, a consumer cannot be expected to check each product before using it to see if it is defective or dangerous.

For all these reasons, the law has developed a doctrine known as "strict liability," that allows a person injured by a defective or unexpectedly dangerous product to recover compensation from the maker or seller of the product, without showing that the manufacturer or seller was actually negligent.

Here's how strict liability works: If you have been injured by a consumer product, you are entitled to compensation from the manufacturer or from the business that sold or rented the product directly to you. Strict liability operates against a non-manufacturer who sold or rented a product only if it is in the business of regularly selling or renting those particular kinds of products. In other words, if you bought something at a flea market stall, garage sale or thrift store that sells all kinds of things but not any one type of item on a regular basis, strict liability may not apply.

**Rules of Strict Liability**

Regardless of what steps a manufacturer or seller says it took in making and handling a consumer product, you can make a strict liability claim, without showing any carelessness on the part of the manufacturer or seller, if all three of the following conditions exist:

1. The product had an "unreasonably dangerous" defect that injured you as a user or consumer of the product. The defect can come into existence either in the design of the product, during manufacture, or during handling or shipment;
2. The defect caused an injury while the product was being used in a way that it was intended to be used;



For The Public

http://public.findlaw.com

Wednesday, Mar. 28, 2007

# Pharmaceutical Drug Liability

Drugs and medicines are frequently at the center of products liability suits. Manufacturers of these products have a duty to appropriately test the drugs and medicines before releasing them into the market, using testing criteria from the U.S. Food and Drug Administration. These criteria are regarded as industry standards, but the fact that a drug was properly licensed by the FDA has no effect on the manufacturer's liability to an injured plaintiff, if the drug proves to be otherwise defective.

As with almost all medical products, with the exception of over-the-counter drugs, there will usually be a "learned intermediary" between a drug's manufacturer and the ultimate user. This can be the doctor who prescribes a drug, a nurse who instructs the patient on proper use, or the pharmacist who fills the prescription. Often the lines of liability are blurry, and an experienced products liability attorney can help a plaintiff determine who may be at fault for resulting injuries.

**Unavoidably Unsafe Products**

Some prescription drugs are considered "unavoidably unsafe" products, which means that they cannot be made completely safe no matter how carefully they are manufactured. Such drugs may have potentially harmful side effects, but may be beneficial to the user nonetheless. If such drugs are properly prepared and accompanied by adequate warnings, they usually cannot form the basis of a successful products liability lawsuit.

More on unavoidably unsafe products.

**Drug Manufacturer's Duty to Warn**

A drug manufacturer has a duty to warn of side effects of a drug when such effects are understood to occur, but is not expected to warn of unknown dangers. Often the manufacturer discharges this duty by providing the necessary information to the patient's prescribing physician or to the pharmacist. The drug manufacturer is considered an expert in its field, and as such it has a continuing duty to keep abreast of knowledge regarding its products and take all reasonable steps to update medical professionals on their potential adverse effects. There is no duty to warn of possible reactions in unusually susceptible consumers, however, but just because a reaction is rare does not mean the manufacturer has no duty to warn about it or that the persons experiencing the reaction are unusually susceptible.

**Time Lapse Issues**

In some drug-related injury cases, the plaintiff will not be able to identify the precise manufacturer or supplier of the defective product because enough time has elapsed that the evidence is no longer available, such as in cases involving drugs ingested during pregnancy. In those cases, the damages may not become apparent until the children are grown. Asbestos-exposure cases are another example of this

FindLaw | For the Public | For Small Business | For Legal Professionals | Find a Lawyer          Search Public          

# FindLaw
For The Public

| HOME | ACCIDENTS & INJURIES | BANKRUPTCY & DEBT | CRIMINAL LAW | DIVORCE & FAMILY LAW | DUI DWI | EMPLOYEE RIGHTS | REAL ESTATE | DANGER PROD |

Legal Issues     FAQ     Dangerous Products A - Z     Recalls     Get Help Now     Resources

FindLaw > Public > Accidents and Injuries > Dangerous Products
My current location: **Dallas, TX | Change location**
✉ **Email**   🖨 **Print**   🔖 **Bookmark**

**Browse Dangerous Products**

**Legal Issues**
**FAQ**
**Dangerous Products A - Z**
**Recalls**
**Get Help Now**
**Resources**

**Find A Lawyer**

**Select type of practice:**
Products Liability L

**Enter City or Zip:**
Dallas
Texas

**Find**

Browse Lawyers by State
Browse by Type of Practice
Submit Your Legal Issue

**Search**

**Enter Search Term:**

Public

**Search**

**Message Boards**

**Select a Board:**
Popular Topics

**Go**

**Featured Attorneys**

**Matthews & Associates**
*Nationwide* - Board Certified Lawyers. "Passion for Justice; Loyalty to our Clients." (888) 222-7052

**Butler, Wooten & Fryhofer, LLP**
*Nationwide* - Reputation, Experience & Dedication. Call 1-800-233-4086 or 1-800-242-2962.

# Why Drugs Get Pulled from the Market

When potentially serious side effects of a prescription medication are well documented and become unreasonably dangerous, the drug may eventually be removed from the marketplace by the U.S. Food and Drug Administration. Usually, when the FDA believes it is clear that a drug no longer has a place in treatment, it will ask the manufacturer to withdraw the drug voluntarily. If a company does not agree, the FDA can bring formal proceedings to require withdrawal.

Many complex factors go into deciding whether a drug should be taken off the market. Here are some major issues, often overlapping, that weigh into the decision-making process.

### Rare, Unpredictable Problems

Most drugs on the market are well-tolerated, and their adverse effects are known. Known side effects cause more injuries and deaths than unrecognized side effects. But some problems happen so infrequently that they can't be seen or predicted before a drug gets on the market. Drugs are typically tested in several thousand subjects, allowing for the detection of relatively common, serious adverse events, such as those affecting 1 in 1,000 people. The practical size of clinical trials means we can't know everything about a drug when it gets on the market. Rare events will only surface when the drug is used in larger numbers of people. Sometimes less severe events that are seen in trials can be used to predict the occurrence of rare, more serious events, but that is not always the case, and such predictions have considerable uncertainty.

L



For The Public

http://public.findlaw.com

Wednesday, Mar. 28, 2007

# Neurontin News

### August 2006: An Estimated 300 Lawsuits Filed Over Neurontin

According to a recent USA Today report, an estimated 300 lawsuits have been filed to date, alleging that Neurontin causes suicide or suicide attempt. A first trial may take place in fall 2006. Plaintiffs allege that Neurontin-maker Pfizer Pharmaceuticals failed to disclose the risk of suicide, and are advocating that the FDA require a black-box warning. Pfizer has responded to the allegations, stating that there is no scientific evidence linking Neurontin to suicide. In December 2005, Pfizer changed the Neurontin prescribing information to include "suicide" and "suicide attempt" as infrequent adverse events.

### April 22, 2005: Neurontin Recall for Empty Bottles and Partially-Filled Capsules

Pfizer Pharmaceuticals and the FDA notified healthcare professionals of the voluntary recall of 40,000 bottles (1 lot) of 100 mg capsules of Neurontin. A mechanical error in manufacturing resulted in some bottles containing empty or partially filled capsules. 100 mg strength capsules from lot #15224V - distributed in October and November, 2004 - are included in the recall. The production lot was distributed only in the United States, and no other Neurontin lots were affected. Click here to read more from the FDA.

### July/August 2004: Drug Maker to Pay $430 Million in Fines, Civil Damages

Pharmaceutical manufacturer Warner-Lambert, a subsidiary of Pfizer Pharmaceuticals, agreed to plead guilty and to pay more than $430 million to resolve criminal charges and civil liability in connection with the illegal and fraudulent promotion of unapproved uses for Neurontin. Click here to read more from the FDA.

Copyright © 2007 FindLaw. ALL RIGHTS RESERVED    Privacy Policy   Disclaimer              About FindLaw   Advertise on FindLaw